IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

FURminator, Inc.,            Case No. 3:07CV1922

    Plaintiff,

v.                               ORDER

Kirk Weaver Enterprises, Inc., et al.,

    Defendants.

This is a suit by a trademark holder, plaintiff FURminator, against an Ohio corporation, Kirk Weaver Enterprises, Inc. (Weaver Enterprises) and its owner. Weaver obtained over 25,000 of plaintiff's pet grooming product after a third party, with whom the plaintiff had contracted to have the product destroyed, sold them to a surplus and salvage company. The defendant corporation resold some of the pet grooming products and remains in possession of the rest.

Plaintiff's action is for trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*; the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*; and for an accounting. Defendants filed an answer, asserting eight affirmative defenses, and put forth a counterclaim for unfair competition and impermissible interference with defendants' contractual relations. [Doc. 19].

This court has jurisdiction over the federal claims under 28 U.S.C. § 1338 and over the state claims under 28 U.S.C. § 1367.

Pending are plaintiff's motion for partial summary judgment on its Lanham Act and Ohio Deceptive Trade Practices Act claims [Doc. 30] and plaintiff's motion for oral argument [Doc. 36].

For the reasons that follow, plaintiff's motion for partial summary judgment shall be granted. Plaintiff's motion for oral argument shall be denied as moot.

## Background

Plaintiff corporation sells a grooming product for cats and dogs known as the "FURminator deShedding Tool." FURminator developed and patented its deshedding tool in the late 1990's. The tool at issue in this case, the FURminator Small Blue Tool (Small Blue Tool), consists of a handle and a toothed blade. Teeth on the blade remove dead undercoat and loose hair from furry pets. The suggested retail price is $34.95, and thousands of retail stores in the United States sell the Small Blue Tool. FURminator's registered marks appear on plaintiff's tools and packaging. Plaintiff spent more than $1 million on marketing and advertising in the United States and Canada in the fiscal years 2003-2006 and has generated goodwill for the FURminator mark.

Defendant Weaver Enterprises is an Ohio corporation. Defendant Kirk Weaver is an Ohio resident and President of Weaver Enterprises. Weaver Enterprises is in the business of locating products offered for sale at distressed prices and purchasing bulk lots of goods to resell for profit.

In 2005 or 2006, FURminator's Chinese manufacturer produced a batch of approximately 133,500 tools that did not meet the company's quality control standards. FURminator tools are packaged for sale in China, shipped to the United States, and forwarded to warehouses operated by plaintiff's fulfillment company. Plaintiff's quality control procedures consist of opening cases at a U.S. warehouse, visually inspecting the tools, and testing the tools on pets; it does not have a dedicated quality control department or a set policy of doing quality control testing on runs of products from its manufacturer. Neither the tools nor the packaging have quality control identifying marks or manufacture dates.

2

In this case, plaintiff discovered the alleged defect through complaints from a Japanese distributor. After receiving these complaints, FURminator determined the scope of the affected tools and obtained a sample of the lots to test. Plaintiff concluded that improperly manufactured metal blades were dull and ineffective. If a customer used the defective tool, it might harm the pet, and, ultimately, damage plaintiff's reputation. In March, 2006, FURminator's manufacturer acknowledged that the tools were improperly manufactured and agreed replace them at no cost.

FURminator took steps to prevent the defective Small Blue Tools from entering the stream of commerce. Of the 133,500 tools plaintiff determined were defective, 69,000 were warehoused in Connecticut.

In December, 2006, plaintiff entered into a contract with its fulfillment company to destroy the defective tools and their packaging. The fulfillment company, in turn, entered into an agreement with Willimantic Waste Paper Company, Inc. (Willimantic). FURminator paid thousands of dollars to have Willimantic destroy the 69,000 tools in Connecticut. In late December, 2006, Willimantic sent a letter certifying it had destroyed the tools; in fact, Willimantic had sold them to third parties, including a surplus and salvage company. The surplus and salvage company, in turn, sold over 60,000 of the tools to Nostalgic Images, Inc. (Nostalgic).

In March, 2007, Weaver Enterprises learned that a large quantity of Small Blue Tools were available for purchase from Nostalgic. After determining that there was a market for the tools, defendants purchased more than 25,000 Small Blue Tools intending to sell them over the internet and at Ohio flea markets. Weaver Enterprises began to sell tools in April, 2007, and by early May they had sold approximately 6,000. Its prices for the tools ranged from $8.00 to $15.95.

Plaintiff learned that unauthorized retailers were selling tools at flea markets, pet trade shows and over the internet at deep discount. It traced the Small Blue Tools to the ones that were to have been destroyed by Willimantic, and learned of Nostalgic's purchase. On May 15, 2007, plaintiff filed for, and was granted, a Temporary Restraining Order against Nostalgic. *FURminator, Inc. v. Nostalgic Images, Inc.*, Case No. 3:07-cv-1411. Judge Katz ordered Nostalgic to respond to expedited discovery and to provide information regarding its sales of the tools. This information implicated sales of over 25,000 Small Blue Tools to Weaver at $1.50 per tool.

On May 25, 2007, plaintiff's counsel advised defendants that the tools they purchased from Nostalgic were defective and demanded that they cease selling the defective tools. The letter also asked defendants to provide certain information regarding Weaver Enterprise's subsequent sales of the tools. In a later correspondence, plaintiff offered to buy back the tools at defendants' cost of $1.50 per tool, plus shipping costs. Defendants refused.

Weaver sent samples of the allegedly defective tools and samples of tools purchased from a retail store to defendants' expert, William Gilman. In late June, 2007, Gilman reported that the allegedly defective tools were not significantly different from the store-bought Small Blue Tools. Defendants notified plaintiff's counsel of the findings.

On June 27, 2007, plaintiff brought this suit and sought an injunction. The following day the parties entered into a consent agreement, which enjoins defendants from selling their stock of the tools until I render further order.

**Summary Judgment**

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, *supra*, 477 U.S. at 324. Summary judgment shall be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## Discussion

Defendants' principal argument is that these tools are not materially different from properly manufactured Small Blue Tools. They strenuously argue that the tools are genuine, and, accordingly, plaintiff is not entitled to protection from the Lanham Act. Defendants argue they are "innocent purchasers" and suggest FURminator acted because defendants were selling Small Blue Tools at a reduced price that undercut the authorized distributers. They also contend that plaintiff's concern – that the tools will injure the animals on which they are used – is disingenuous, as no animals have been shown to have been injured from the tools obtained by defendants.

**1. Lanham Act**

FURminator's first claim alleges defendants violated the Lanham Act, 15 U.S.C. § 1125(a), which provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

As a general rule, trademark law does not apply to the sale of genuine goods bearing a registered trademark, even if the sale is without the mark owner's consent. *Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007); *see also H.L. Hayden Co. of N.Y. v. Siemens Medical Systems*, 879 F.2d 1005, 1023 (2d Cir. 1989) ("the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation"). However, distribution of a non-genuine product bearing a mark constitutes trademark infringement. *El Greco Leather Prods. Co. v. Shoe World*, 806 F.2d 392, 397 (2d Cir. 1986), *cert. denied*, 484 U.S. 817

(1987).[1] Therefore, I must consider whether defendants sold a "genuine" product under the FURminator mark in order to determine whether trademark law applies.

### A. The Defective Tools Are Not Genuine

A trademark signifies that goods sold under it are of equal quality. A trademark holder is able to control the quality of the goods and a trademark acts as an indicator of consistent quality. J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3:10 (4th ed. 1992).

The Lanham Act affords the trademark holder the right to control the quality of goods manufactured and sold under its trademark. *El Greco Leather Products Co.*, *supra*, 806 F.2d at 395. Indeed, and especially important in this case, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Id.* (citing *Professional Golfers Association of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670-71 (5th Cir. 1975)).

Goods are not genuine goods until their sale is authorized by the trademark owner. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24, comment c (1995). In *Ryan v. Volpone Stamp*

---

[1]

Defendants claim that the Sixth Circuit has not yet embraced *El Greco*. As I read the case, I fail to see any substantial distinguishing facts. There, as here, the trademark holder contracted for a third party to manufacture goods bearing plaintiff's trademark, and there, as here, unapproved items were sold by an unauthorized distributor. *El Greco*, in short, ensures the trademark owner's ability to maintain quality control over its products and protects the corporation's goodwill.

In light of the core issues of *El Greco* and this circuit's recent favorable treatment of the case, *see, e.g.*, *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006); *Abercrombie & Fitch v. Fashion Shop of Ky., Inc.*, 363 F. Supp. 2d 952, 959-60 (S.D. Ohio 2005) (noting that *El Greco* has been "cited often by . . . district courts within the Sixth Circuit"); *Too, Inc., v. TJX Co, Inc.*, 229 F. Supp. 2d 825, 832-33 (S.D. Ohio 2002), I find the *El Greco* analysis applicable to the facts of this case.

*Co., Inc.*, 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000), the court provided a framework for analyzing whether goods are genuine:

> First, the court must consider whether the trademark owner authorized the first sale of the goods. Second, the court must consider whether the goods were genuine. . . . If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.

Courts in the Sixth Circuit are in agreement with the Second Circuit. *See, e.g., Abercrombie & Fitch v. Fashion Shop of Ky., Inc.*, 363 F. Supp. 2d 952, 962 (S.D. Ohio 2005) (stating that merchandise which has not been approved for sale by the trademark owner "falls squarely within the *El Greco* rule" and is easily categorized as infringement); *Too, Inc. v. TJX Companies, Inc.*, 229 F.Supp.2d 825, 834 (2002) (using a Southern District of New York case in genuineness analysis of goods not authorized for production).

In this case, there is no dispute that FURminator did not authorize or approve the sale of the tools at issue. FURminator ordered the goods from their manufacturer. It determined certain Small Blue Tools did not meet its quality control standards and decided that it would not authorize these tools for sale. To keep these tools from entering the marketplace, FURminator undertook to implement their disposal, paying Willimantic to destroy the tools. It did not ship these tools to a different country for sale, nor did it reduce the price of the tools. Moreover, it did not give Willimantic permission to sell the tools. Willimantic sold them without FURminator's knowledge.

Defendants do not argue that first sale of the Small Blue Tools was not unauthorized; rather, they assert their tools are not significantly different and focus on case law addressing the unauthorized sale of genuine goods. *Monte Carlo Shirt, Inc. v. Daewoo Int'l Corp.*, 707 F.2d 1054, 1058 (9th Cir. 1983) ("the goods sold by Daewoo . . . were the genuine product"); *CPC Int'l, Inc. v. Blandito Food Distrib. Corp.,* 835 F. Supp. 636, 638 (S.D. Fla. 1993) ("[t]his case involves

the distribution and sale of genuine Mazola corn oil"). However, defendants' cases are inapplicable where, as here, the initial sale of the trademarked product was not authorized. *See, e.g.*, *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("the question of whether a good is genuine . . . presupposes the initial sale was authorized").

Defendants assertions are unconvincing. The tools defendants purchased for $1.50 from Nostalgic cannot be considered genuine.

### B. The Lanham Act is Applicable

In light of the foregoing, defendants argue that FURminator's trademarks are unenforceable because plaintiff does not have a dedicated quality control department; does not have written procedures for a systematic and regular examination of its goods; and did not inspect, police, or otherwise exercise quality control over its Chinese manufacturer's facilities.

It ill behooves defendants to second guess FURminator's determinations regarding its quality control standards. Plaintiff's quality control standards are irrelevant; if a seller, for whatever reason, concludes that a product from a supplier does not meet quality standards, it can protect its interest in its trademark in the product by keeping it off the market. What is legally significant is that FURminator attempted to exercise quality control as thoroughly as it could by arranging to have the goods destroyed. Moreover, defendants provide no case where a trademark holder's quality control standards were deemed insufficient when the holder itself rejected goods under its standards. The right to control the quality of goods remains the right of the trademark holder.

Defendants next assert that a trademark holder's right to control the quality and distribution of goods is not absolute. To the extent that this is true, and indeed courts have recognized exceptions and denied claims for trademark infringement, it does not trump FURminator's right to control the

quality of its own goods in this case. Defendants' expert's report is irrelevant – Kirk Weaver and Weaver Enterprises have no right to control the quality of plaintiff's goods. By disregarding FURminator's determination, employing their own quality standards, and selling the tools under FURminator's mark, defendants violated FURminator's right under the Lanham Act to retain control of the use of its trademark in the sale of the product.

## 2. Ohio Deceptive Trade Practices Act

FURminator's second claim alleges defendants violated the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.* The Act provides:

> A person engages in a deceptive trade practice when . . . the person does any of the following:
>
> \* \* \* \* \*
>
> (2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
>
> \* \* \* \* \*
>
> (10) Disparages the goods, services or business of another by false representation of fact.

O.R.C. § 4165.02(A).

"The Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act [15 U.S.C. § 1125(a) ]. . . . In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1431 (S.D. Ohio 1990); *see also Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146

F.3d 350, 354-55 (6th Cir. 1998); *DeGidio v. West Group Corp.*, 191 F.Supp.2d 904, 910 (N.D. Ohio 2002).

Accordingly, the analysis under the Lanham Act claim is applicable to plaintiff's claim under the Ohio Deceptive Trade Practices Act.

### 3. There Are No Material Facts in Dispute

Defendants assert that there are a number of material facts in dispute. They claim the allegedly defective tools are not defective because defendants' expert could not distinguish a Weaver Enterprise tools from a Small Blue Tool purchased at a retail store. According to defendants, their tools are not materially different from the trademarked product, and for this reason the Lanham Act is inapplicable. Defendants also claim the tools pose no danger to pets; they have not received complaints that their tools did not work properly or that they injured a pet. In addition, defendants state the parties disagree about FURminator's quality control procedures, claiming the sufficiency of plaintiff's quality control is a determinative factor under an *El Greco* analysis.

Drawing all factual inferences in favor of defendants, as I must, I nonetheless find FURminator is entitled to trademark protection. Again, the actual quality of the goods is "legally irrelevant," *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006), and determinations on the likelihood of harm to pets or the sufficiency of FURminator's quality control are not needed in this case. The defendants' arguments are not persuasive. Their concerns have already been addressed and do not present genuine issues of material fact.

There is no legal basis on which defendants can prevail. To permit them to do so would put trademark holders and the good will of their products, names and reputations in substantial jeopardy,

while serving no useful purpose, other than to enrich persons who, like defendants, seek to profit from the malfeasance of an intermediary.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT

1. FURminator's motion for partial summary judgment [Doc. 30] be, and the same is hereby granted; consent decree previously entered to remain in full force and effect pending entry of permanent injunction; plaintiff to submit proposed injunction by April 15, 2008; and

2. FURminator's motion for oral argument [Doc. 36] be, and the same is hereby denied as moot.

So ordered.

<u>s/James G. Carr</u>
James G. Carr
Chief Judge